[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT
CT Page 15521
In early 1998, the West Haven Housing Authority solicited bids to perform masonry work. Prospective bidders were furnished with a project manual which contained the plans and specifications for the job. The manual contained a bid form, a form of contract, a performance and payment bond and general conditions of the contract for construction. On April 9, 1998, the executive director of the Housing Authority sent a written letter awarding the job to the plaintiff. On April 20, 1998, the defendant Housing Authority, again acting through its executive director, sent a letter to the plaintiff repudiating and revoking the award of the contract. The court will discuss other facts and refer to the Project Manual and Bid Form for this job as it becomes necessary during the course of its decision. Both parties have filed cross motions for summary judgment. The plaintiff has moved for judgment as to liability. The standards to be applied on motions for summary judgment are well known. The court cannot grant such a motion if there is a disputed issue of material fact. The court will now discuss the various claims and counterclaims of the parties on the legal issues presented.
 I
In this case, the plaintiff has brought a breach of contract claim. The defendant argues that no contract had been entered into between the parties. The defendant also maintains that even if such a contract had been entered into, the plaintiff cannot now bring its breach of contract claim because the plaintiff failed to exhaust its administrative remedies. The defendant also makes a broader claim relying on the case of Lawrence Brunoli,Inc. v. Town of Branford, 247 Conn. 407 (1999). The court will deal with the argument under Brunoli first. Basically, Brunoli
held that a trial court, faced with a claim by an unsuccessful bidder against a municipality, lacks subject matter jurisdiction to consider a damage claim; that is, where a municipality has engaged in fraud, corruption or favoritism in the bidding process, an unsuccessful bidder has standing under the applicable municipal bidding statute only to bring an action for injunctive relief. The defendant basically argues whether a contract was formed here by the sending of the award letter to the plaintiff is irrelevant under Brunoli. At pp. 9-10 of its March 3, 1999 brief, the defendant argues: "In the present case, the plaintiff contends that Capasso brought a breach of contract claim rather than a bid protest as was the case in Brunoli and, therefore, CT Page 15522Brunoli is unapplicable to this case. However, the argument is without merit. Just as in Brunoli, the plaintiff here claims that he is entitled to sue for damages for breach of contract in a public contract matter. Just as in Brunoli, the law, as set forth by the Connecticut Supreme Court, establishes that in such a setting the plaintiff has no right to sue for damages. The only remedy available to the plaintiff was to file an injunction to prevent the case from going forward until a court ruled on the merits of the claim of the plaintiff."
The defendant apparently relies on language at p. 409 of the opinion where before going on to discuss the merits of the case the court said for the purposes of the appeal it assumed that the allegations of the revised complaint were true and noted that the plaintiff (Brunoli) "was informed that it was the "lowest qualified bidder', but that the defendant subsequently withdrew its award of the contract to the plaintiff because the plaintiff had failed to attend a prebid conference . . ." 247 Conn. at p. 409. As noted, the defendant seems to argue from this language that Brunoli stands for the proposition that even if the sending and receipt of the city's award letter created a binding contract, or more generally, even if a contract had come into existence, a plaintiff cannot sue in damages under the contract but is confined to the remedy of an injunction if the city breached the contract or tried to terminate its contractual obligations. This, however, is not what Brunoli really says; ifBrunoli were taken to have adopted this position, it would be a position that is contrary to rulings in numerous other jurisdictions and would raise possible due process constitutional arguments.
The Brunoli court never addressed the issue of whether a binding contract had, in fact, been created between Brunoli and Branford before it told Brunoli the job was in fact not being assigned to Brunoli. The continuing discussion in Brunoli makes clear it was analyzing the case under traditional law that holds that injunctive relief not damages is the only remedy for an "unsuccessful bidder" as opposed to a party who already had a contract which the city rescinds. In fact, the language of the dissent indicated that that was what was involved in Brunoli, where at p. 417, it characterizes the factual setting for the legal issues before the court. Justice Berdon said: "In the present case, the plaintiff, Lawrence Brunoli, Inc., alleges that the defendant, the Town of Branford, had informed the plaintiff that it was "the lowest qualified bidder' for the construction CT Page 15523 project in question but did not award the contract to the plaintiff because it apparently failed to attend a prebid conference." By any argument, merely informing a company that it is the lowest qualified bidder cannot be tantamount to an award of a contract — in most of these cases, as here, the project manual for the job reserves the town's right to reject any and all bids. See 247 Conn. at p. 411; court refers to JohnBrennan Construction Corporation, Inc. v. Shelton, 187 Conn. 695,702 (1982). Thus, Brunoli was dealing with the situation of an unsuccessful bidder, not the claim of a party who argued that a contract had been formed between it and the city.
As noted, it is fairly universally held that where in fact a contract has been formed between the city and a contractor, suit can be brought by the contractor for breach and the contractor is not confined to seeking injunctive relief.
Thus, in 64 Am.Jur.2d 833 et seq, "Public Works and Contracts "the general rule and the reasons behind it are stated as they are in Brunoli. At § 86, p. 948 it says:
 "A bidder for public work cannot base a right of action for damages against the public body upon a statutory requirement that contracts for the performance of public work shall be let to the lowest bidder, and cannot recover lost profits in case the contract is, contrary to the statute, awarded to a higher bidder. Such a statutory provision, enacted as a protection to the public cannot be used to make disobedience of its provisions by public officers a double service of punishment to the public body. .
The commentary immediately goes on to say:
 "Many cases, however, take the position that if a binding agreement came into existence when the award was made, the public body cannot revoke the award. Accordingly, there are numerous instances in which a bidder's right to recover damages for the breach of the contract inherent in the public body's attempted revocation of the prior award is upheld. Thus the right of a bidder to sue for damages for the rejection of his (sic) bid is to be distinguished from his (sic) right to maintain an action for damages for the failure or refusal of public authorities after the acceptance of his (sic) bid, to execute the contract and carry out its terms."
See City of Susanville v. Lee C. Hess Co., 290 P.2d 520, 526
(Cal. 1955), Premier Elec. Const. v. Chicago Board of Education, CT Page 15524388 N.E.2d 1088, 1092, 1094 (ILL. 1979), U.S. v. Purcell EnvelopeCo., 249 U.S. 313, 319 (1919), Northeast Mississippi CommunityCollege District v. Vanerheyden Construction Co., 800 F. Sup. 1400,1402 (ND Miss. 1992), Muncy Area School District v.Gardner, 497 A.2d 683, 686 (Pa. 1985), Conwell Corp. v. City ofAlbuquerque, 802 P.2d 634, 638 (N.M. 1990). In Safety InsulationW C Co. v. Mayor of Baltimore, 66 F. 140 (CA. 4, 1895), the city was funded by the state to do a project and authorized to let a contract out to the lowest responsible bidder. The city accepted the plaintiff's proposal but two days later, as work was about to begin, sought to revoke the contract. The court held that such attempted revocation of the assent of the city was no defense to the plaintiff's contract action. The court said the courts cannot control discretionary action by a city but once that discretion has been exercised, public improvements decided on, and a contract has been entered into, the discretion is exhausted and the city's duty has become ministerial; . . "the obligation of a contract made between parties competent to contract cannot be impaired at the option of one of the contracting parties. This doctrine controls whether the party to a contract be a sovereign state or a humble individual . . . And municipal corporations, mere creatures and agents of the sovereign, are not exempted from the operation of this rule." Id. p. 144, cf Lynch v. Mayor etc. City of New York, 27 N.Y.S. 798, 802 (1896), cf Municipal Corporations, McQuillan, Vol. 10 § 29.71, 29.80. Also see generally, 3 ALR3d 864 "Revocation, Prior to Execution of Formal Written Contract, of Vote or Decision of Public Body Awarding Contract to Bidder"; the whole article proceeds on the assumption that if an "award" cannot be properly revoked and a binding contract exists then the public authority can be sued on the contract — simply put the issue in the article as the issue here is succinctly stated at p. 867: "Many cases within the scope of the annotation take the position that if a binding agreement came into existence when the award was made, the public body cannot revoke the award, but if no contract arose at theat time, revocation of the award prior to the execution of the formal contract is proper.
The reason for the distinction becomes apparent, if we examine the underpinnings of a case like Brunoli.
The Brunoli court, at 247 Conn., p. 414, set forth one of the basic reasons for its position: "if, however, an unsuccessful bidder is permitted to assert a claim for money damages, rather than injunctive relief against awarding the contract to the CT Page 15525 successful bidder, the taxpayers of the municipality would be subject to paying once to have the work performed by the successful bidder and, if the unsuccessful bidder were successful, again for damages above and beyond the cost of the project. Such extra costs clearly are not in the public interest."
When the municipality has entered into a binding contract this reasoning is less easy to support. It is basic law as stated in McQuillan that: "Municipal contracts are measured by the same tests and are subject to the same rights and liabilities as are other contracts. It follows that a city may be sued on its valid contracts, see § 29.124, Municipal Corporations. It is certainly important that taxpayers save money. But in a governmental regime that purports to act under the rule of law there are values that should be more important than saving money — if the state or one of its subdivision has entered into a contract why should the relief provided for its breach be any less extensive than an action for breach against a citizen or business?
But there are less abstract reasons for such a policy. Once a contract has been entered into the contractor is more likely to have incurred various prep costs and small businesses may focus on preparing for the particular job they believe is theirs, ignoring the possibility of bidding for other work and preparing for such bidding. If municipalities can breach such contracts and the contractors can only pursue claims for injunctive relief the pool of qualified bidders will necessarily shrink — the attractiveness of public works contracts are less apparent, if municipalities can renege on contracts and not face damage claims. If that results, costs will go up in the long run even though in any particular case the city appears to save money. In conclusion, the court does not accept the argument that, even if a contract was formed by the sending of the award letter, Brunoli
precludes a breach of contract action for damages.
The court must now address two other issues which would not have to be dealt with if the foregoing position of the defendant as to Brunoli had been accepted. The court must determine if a contract had been made here between the parties by the sending and receipt of the defendant's award letter. If a contract had not been so made, then of course Brunoli would, in fact, apply and the breach of contract claim would have to be dismissed. Also, the defendant advances the argument that, even if such a CT Page 15526 contract had been made, the court has no jurisdiction to entertain the breach of contract claim for damages because the plaintiff had failed to exhaust administrative remedies provided for by the defendant to review such a claim. The court will try to deal with the exhaustion claim first.
 II
The following discussion will assume for the purposes of discussion that a contract had been formed here by the sending of the award letter.
Let us assume then that a contract was entered into between these parties as a result of the bid submitted by Capasso and the award letter sent by the defendant to Capasso. Should the plaintiff be deprived of a contract remedy because of its failure to exhaust administrative remedies? The defendant points out that the defendant Housing Authority had "protest procedures" and pursuant to these procedures "the plaintiff was afforded an opportunity to attend a hearing at the Housing Authority in regard to the claim of the plaintiff that it was entitled to perform the work referred to in this matter." (Supplemental Brief, April 14, 1999, pp. 1-2.) Citing Housing Authority v.Papandrea, 222 Conn. 414 (1992), the defendant argues that, if an adequate administrative remedy exists it must be exhausted and, unless it is the Superior Court, has no jurisdiction to act — subject matter jurisdiction is implicated and that issue must be decided as a threshold matter. The defendant goes on to note that the only exception to these rules is a situation where the administrative remedy would be inadequate or futile. But it points to an affidavit submitted by its executive director to rebut any notion that such would be the case here. Mr. Siwak did set up a hearing date under the protest procedure, but the plaintiff's then attorney and the plaintiff did not appear on that date. The defendant goes on to argue that the plaintiff cannot make a conclusory argument about the futility of any administrative remedy. It quotes from Papandrea . . . "by not appearing before the board (Housing Authority) the plaintiff not only deprived the defendant board of the opportunity to hear, analyze and review a matter within its responsibility and expertise but also deprived himself of the opportunity to put his case and to make a proper record in which to seek judicial relief in the event he was terminated. 222 Conn. at p. 431. Papandrea
relied on LaCroix v. Board of Education, 199 Conn. 70 (1986), where the court similarly ruled there was a failure to exhaust CT Page 15527 administrative remedies; there a tenured teacher challenged the termination of his contract by the board. After the board voted to terminate him, the teacher did not attend a scheduled hearing nor did he request a subsequent hearing as he was entitled to. Id., p. 87. As LaCroix notes exceptions to the exhaustion doctrine are infrequently found. Id., p. 79.
The court will now try to deal with the exhaustion claim. First the court will address an argument made by the plaintiff to the effect that the court need not even address the merits of the exhaustion claim raised by the defendant. The plaintiff argues that the exhaustion doctrine does not apply because a binding contract was entered into by the defendant Housing Authority, and any remedies available to the plaintiff flow from that contract. No authority is cited for this board proposition and the court cannot conclude that intolerable burdens would be placed on contract rights because government entities provide-administrative remedies where a breach of contract is claimed. Access is open to the courts if the administrative process does not resolve the matter. The court could not find any case directly on point. But the comments of one trial court are relevant on this issue. By way of background in Shortt v. NewMilford Police Dept., 212 Conn. 294, 310 (1999), it was held that workers advancing claims to recover wages under statutes authorizing such suits must exhaust administrative remedies provided for the resolution of such suits before going to court. But what if a worker, in addition or in lieu of a statutory claim, seeks to advance a common law contract claim? In Tooley v.Metro North Commuter R.R., 1999 Ct. Sup. 3086 (Blue, J.), a railroad worker filed a contract claim in a wage dispute. The court said: "While Shortt does not address the question of common law contract claims, such as that asserted in the second count of Tooley's complaint, the board's language of the RLA (Railroad Labor Act) leaves no doubt that such claims also require exhaustion where they are inextricably intertwined with the consideration of the labor contract." The contract claim here finds its basis in the action of the state in permitting its municipal subdivisions to enter into contracts regarding municipal housing projects. A reading of chapter 128 indicates that local housing authorities are subject to applicable state and federal law in conducting their authorized activities. The court without exploration of these questions by counsel cannot determine that claims that may be subject to administrative resolution — bid, protest and contract claims — are not by the nature of these public contracts "inextricably CT Page 15528 intertwined" with state and federal policies, regulations and requirements applicable to these kinds of contracts. The court will, therefore, not hold that the exhaustion doctrine does not apply merely because a common law contract claim is being advanced against a public agency. See also, Murphy v. Young,44 Conn. App. 677, 681-82 (1997).
However, having said all this, the court does have serious question as to whether the exhaustion doctrine should apply to this case. The court's concerns lie in the "regulatory scheme" which provides for an administrative resolution. In its brief, arguing for the exhaustion doctrine, the defendant attaches the defendant Housing Authority's "Statement of Procurement Policy." Section VII of that policy provides for administrative resolution in two situations:
B. Bid Protests
 "Any actual or prospective contractor may protest the solicitation or award of a contract for serious violations of the principles of this statement. Any protest against a solicitation must be received before the due date for receipt of bids or proposals, and any protest against the award of a contract must be received within ten calendar days after contract award, or the protest will not be considered. All bid protests shall be in writing, submitted to the contracting officer or designee who shall issue a written decision on the matter. The contracting officer may at his or her discretion suspend the procurement pending resolution of the protest, if warranted by the facts presented.
C. Contract Claims
 All claims by a contractor relating to performance of a contract shall be submitted in writing to the contracting officer or designess for a written decision. The contractor may request a conference on the claim. The contracting officer's decisions shall inform the contractor of its appeal rights to a higher level in the WHHA (West Haven Housing Authority), such as the executive director or a designated board member, or a Procurement Appeals Board."
One of the difficulties the court has in analyzing this issue is the fact that the entire "Statement of Procurement Policy" has not been attached, only two subsections of it, so it is difficult for the court to determine the operative principles of the policy which might have some bearing on the scope of the administrative remedy provided. Clearly, Section "C. Contract Claims" does not CT Page 15529 provide an administrative remedy to someone in the plaintiff's position. That section obviously deals with actual disputes that arise during performance of the contract which both sides agree has been entered into. Section "B. Bid Protests" does speak about protests by "actual or prospective" contractors who "may protest the solicitation or award of a contract." The claim raised here does not concern pre-award concerns over the manner in which bids were solicited. Nor does it involve "any protest against the award of a contract" which the subsection goes on the say "must be received within ten calendar days after contract award," i.e. a protest against the award of a contract to another party. The claim here, is that in fact an award had been made to the plaintiff and the dispute is whether in fact that award created a binding contract." Mr. Siwek, the executive director of the Housing Authority submitted a revealing affidavit in this regard on behalf of the defendant Housing Authority. Throughout his April 6, 1999 affidavit, he characterizes the problems his agency had with the plaintiff, which presumably could be addressed administratively, as one involving a "Bid protest discussion;" he noted the plaintiff's attorney never attended the hearing he had scheduled "in regard to the protest of the bid relating to . . . the job." The last paragraph of Mr. Siwek's affidavit further focuses the issue — it states the plaintiff "did not attend a hearing at the Housing Authority in regard to their protest of the bid award to Premier — New York in this matter." But the plaintiff's problem all along has been that, rightly or wrongly, it claims the defendant breached an existing contract already formed before the purported award of any contract to Premier — New York. What purpose would be achieved by an administrative remedy that, at the most, could have negated the subsequent award of the job to another entity for "serious violations of the principles of this statement." As noted, the entire "Statement of Procurement Policy has not been submitted to the court so how can it ascertain the "principles" of the statement. And, if the "principles" boil down to underlining the goal of awarding the contract to the "lowest responsible bidder," what does that have to do with providing an administrative remedy prepared to renege on the subsequent award of the contract to Premier — New York on the theory that a contract had earlier been formed by the sending of the award letter to Capasso by the defendant? One of the primary rationales for the exhaustion doctrine is that resort to the administrative remedy may relieve the courts of the burden of resolving matters "that may be resolved satisfactorily through the administrative process." Loulis v. Parrott, 241 Conn. 180, 191 (1997). It has CT Page 15530 not been made clear to the court how the purported administrative remedy here could achieve that goal. cf. Mckart v. United States,395 U.S. 185, 195 (1969).
True, an administrative remedy to be adequate "need not comport with the plaintiff's opinion of what a perfect remedy would be" Hunt v. Prior, 236 Conn. 421, 434 (1996). But the party offering the doctrine as a defense based on subject matter jurisdiction must bear some burden to show that the relief sought could have been provided at the administrative level. cf. Johnsonv. Statewide Grievance Committee, 248 Conn. 87, 104 (1999).
There is another reason which provides the court with some reluctance to apply the exhaustion doctrine here. One basis for the doctrine is said to be that, by allowing the agency to hear the dispute in the first instance, the agency will "afford the parties and the courts the benefit of its experience and expertise without the threat of litigation interruption." 2 Am.Jur.2d § 505 at p. 491.
In fact, "judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or to apply its expertise." McKart v.United States, supra at 395 U.S. p. 194. What record, what expertise peculiar to an administrative agency? The issue here is whether there was contract formation because of the sending of an award letter. This is the type of matter best resolved by the courts as a question of law or through appropriate jury instructions if contract formation is determined to be a question of fact. In Borden, Inc. v. FTC, 495 F.2d 785, 787 (CA. 7, 1974), the court held an administrative remedy may be bypassed if "the issue involved is a strictly legal one not involving the agency's expertise or any factual determinations;" the court cited McKartv. United States, 395 U.S., pp. 195-197.
Candidly speaking the basic problem the court has is this: where an agency document purports to provide an administrative remedy, but it is unclear from that document whether that remedy applies to a particular dispute before the court, should the same or similar presumptions favoring such a finding and thus demanding exhaustion be applied, as for example, apply to the interpretation of contracts in such a way as to favor a finding of arbitrability, see for example, Moses H. Cone MemorialHospital v. Mercury Construction Corp. , 460 U.S. 1 (1983). It is one thing to say a policy favoring arbitration should create CT Page 15531 certain presumptions in its favor when interpreting contract language; the contract was arrived at by two independent parties presumed to be aware of their interests and rights who negotiated against the background of the known policy favoring arbitration. Where regulations or policies providing for an administrative remedy are imposed by the state or one of its subdivisions, it seems to the court that the terms of relief thereby provided should be made clear. When it is not made clear, the danger of arbitrariness, created for the occasion diktats, and confusing delay is not a burden that should be borne by citizens and business when dealing with what is, after all, their own government and its subdivisions and agencies.
In any event, even if the foregoing analysis is incorrect and there was an administrative remedy available, there is a serious factual dispute as to whether, in fact, any such remedies were exhausted. Mr. Capasso submitted an extensive affidavit dated July 28, 1999, stating generally that the agency refused to provide the information or documentation necessary for it to prepare for the purported administrative hearing date of May 22, 1999. The court will not analyze the factual claims made in the Siwek and Capasso affidavits — suffice it to say there is a factual dispute presented as to whether the plaintiffs exhausted any remedies available and received sufficient agency information or cooperation from the latter in order for the defendant to fairly claim the benefit of the exhaustion doctrine. Exhaustion has been held not be required, for example, where an agency, in effect, refuses to act. Weltz v. Board of Education of Scotland,329 N.W.2d 131 (S.D. 1983); City of Lake Station v. Moore RealEstate, 558 N.E.2d 824, 828 (Ind. 1990). A full evidentiary hearing on this question would have been the most appropriate method of resolving it. This was done in the previously cited case of Tooley v. Metro North Commuter R.R., 1999 Ct. Sup. 3086. The court concludes it cannot find for the defendant on the argument it made under the exhaustion doctrine and will now review what in effect it has decided as a result of the foregoing discussion and what remains to be decided.
The court has decided to this point that if a contract was formed between the parties (1) nothing in Brunoli requires the dismissal of the plaintiff's contract claim, and (2) application of the exhaustion of administrative remedies doctrine will not allow the court to dismiss the claim here — either there was no such administrative remedy or a genuine factual dispute exist as to whether the remedy was, in fact, exhausted. The CT Page 15532 court, therefore, cannot grant the defendant's motion for summary judgment on either of' these two grounds.
The court will now examine the underpinning of the assumption it has made in its foregoing discussion — that is, was a contract created by the sending of the award letter. If the court can decide as a matter of law that such a contract was formed, then the plaintiff, in light of the previous discussion is entitled to prevail on its motion for summary judgment. If the court decides as a matter of law that a contract was not formed by the sending of the letter, the defendant should prevail on its motion. If the issue of contract formation is properly one of fact to be decided by the trier, neither side is entitled to the relief requested in their respective motions.
 III
This, for the court at least, is a difficult issue. There is no doubt that an award letter was sent to the plaintiff after it submitted its bid. The letter of April 9, 1998, from the defendant's executive director said: "I am pleased to inform you that your firm has been awarded the Building Envelope Repair and Waterproofing work at Surf Side 200 . . . "The letter goes on to say that the "clerk of the works" . . . "has scheduled a preconstruction meeting for Monday, April 13th at 10 a.m." On April 20, 1998, Mr. Siwek, on behalf of the defendant sent a letter to the plaintiff which said, "It is my unhappy duty to inform you that the West Haven Housing Authority cannot award you the bid for Building Envelope Repair and Waterproofing at Surf Side 200."
The question then is whether the award letter of April 9 in fact created a binding contract. If it did, the April 20th letter is a nullity. On the other hand, the issue can be viewed as follows — was the April 20th letter an appropriate revocation of the award letter before a formal written contract had been entered between the parties, which must be viewed as a prerequisite to contract formation.
Generally speaking, it has been held that the acceptance of a responsive bid — that is, an award — creates a contract, cf. Dick Fisher Dev. V. Dept. of Administration,776 P.2d 1153, 1155 (Alaska, 1989); State v. Zia, Inc.,556 P.2d 1257, 1261, n. 12 (Alaska, 1976); City of Susanville v. Lee C.Hess Co., 290 P.2d 520, 527 (Cal., 1955), cf. U.S. v. PurcellCT Page 15533Envelope Co., 249 U.S. 313, 319 (1919). The City of Susanville
case at 290 P.2d, page 526, makes the problem seem quite clear and unequivocal. "The making of the award gives rise to a contract between the public body or agent and the successful bidder," quoting from Application of City of Susanville,285 P.2d 1007, 1009 (Cal., 1955).
But the problem is somewhat more complicated as the following quotes indicates. McQuillin, Municipal Corporations, 3d ed. rev., Vol. 10, § 29.80 at page 529, frames the problem and hints at its complexity by saying:
 "However, in many cases it has been observed that the mere acceptance of a bid does not necessarily constitute a contract. Whether a contract was complete on the award, or a subsequent written contract was contemplated depends upon a proper construction of the steps taken by the parties concerned, in view of the applicable law. Ordinarily, no written contract need be executed, unless required by statute, but the improvement ordinance, the successful bid duly signed, and the resolution accepting the bid duly passed and entered of record constitute a written contract."
Similarly, an aptly entitled article, "Revocation, Prior to Execution of Formal Written Contract, of Vote or Decision of Public Body Awarding Contract to Bidder," 3 ALR 3d, p. 864, contains the following observation at p. 867.
 "Speaking generally, whether an action for breach of contract can be maintained depends on many factors. The most important one, as respects the present discussion, is whether a binding agreement between the bidder and the public body came into being at the time the award was made. Under general contract law, whether the parties to an informal agreement become bound prior to the execution of a contemplated formal writing depends largely on their intention."
Also see Restatement, Second, Contracts, § 27, comment C, which sets out factors to consider in deciding whether a contract can be considered to have been created despite the fact a formal written document or memorial of the agreement is contemplated. These observations focus the problem for the court since if the issue can be framed in terms of what the intention of the parties was, then in general, the question of contract formation is one for the jury and not for the court; see Randoloh Constr. Co. v.King's East Corp. , 165 Conn. 269, 277 (1973). CT Page 15534
At first blush, it would appear that the sending of the award letter created a contract. Paragraph 8(g) of the Project Manual says:
 "A written award shall be furnished to the successful bidder within the period for acceptance specified in the bid and shall result in a binding contract without further action by either party."
As said in Levine v. Advest, Inc., 244 Conn. 732, 746 (1998), "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to that intent." But a court cannot focus on one sentence or portion of the documents relevant to the issue of contract formation.
What has caused the court difficulty is seemingly contrary expressions of intent in other documents and the Project Manual. As the defendant notes, according to the "general conditions of the contract for construction" set forth in the Project Manual, "contract" means "the contract entered into between the PHA/IHA and the Contractor. It includes the forms of Bid, the Bid Bond, the Performance and Payment Bond or Bonds or other assurance of completion, the Certifications, Representations, and other Statements of Bidders (form HUD-5369-A), these General Conditions of the Contract for Construction (form HUD-5370), the applicable wage rate determinations from either the U.S. Department of Labor or HUD, any special conditions included elsewhere in the contract, the specifications and drawings. It includes all formal changes to any of those documents by addendum, change order or other modification."
Paragraph 4 of the "Bid Form" states that if written notice of the acceptance of the bid is mailed within the indicated time period the bidder "agrees to execute and deliver a contract in the prescribed form and furnish the required bond within ten (10) days after the contract is presented to him/her for signature." The plaintiff signed the bid form indicating it understood its terms and conditions on March 25, 1998, two weeks before the sending of the award letter on April 9, 1998.
In other words, the defendant that offered the Project Manual to prospective bidders which contained the language in paragraph 8(g) also prepared the "Bid Form" which talked in terms of a formal signed contract. And it appears undisputed that at no time up until the revocation letter of April 20, 1998, did the plaintiff complete or sign the Form of Contract required by the CT Page 15535 "Bid Form."
In its 7/28/99 reply brief, the plaintiff argues that these considerations are irrelevant on the issue of contract formation and whether a formal written contract was required for such contract formation. At page 3, the plaintiff notes that the defendant "fails to allege that the contract was ever presented to Capasso . . . moreover (the April 20th" revocation letter) makes no mention of the failure to sign the contract or submit bonds but states, instead, that the contract was being awarded to Premier New York, another contractor."
In a somewhat conclusory fashion, the plaintiff goes on to argue that any requirements "with respect to the signing of the contract or the submission of bonds cannot be construed to be conditions precedent to the formation of a contract (particularly in the face of 8(g) of the contract) since those requirements do not speak in terms of condition precedent or in terms of contract formation."
But the real issue is whether looking at all the contract or pre-contract documents the court can say as a matter of law it was or was not the intention of the parties that there would be contract formation without the signing of a formal written contract. The defendant may not have submitted the contract to Capasso but the reference to the signing of such a contract is what is critical and whether the contract was or was not actually submitted for signature is not determinative, but the fact that the language of the "Bid Form" contemplated or at least can be interpreted as saying, in light of its reference to a signed contract, that no actual contract would be created until a contract was in fact submitted and signed. In other words, the court cannot say as a matter of law, using the tests set forth in comment (c) of § 27 of the Restatement, Second, Contracts, that the absence of a "written memorial" is irrelevant to the issue of contract formation and that "the award letter was a sufficient manifestation of assent" to conclude a contract was formed here. This is not to say the plaintiff does not have a powerful argument and that as a trier of fact the court would not rule in its favor, but the defendant has the right to a jury trial and should not be deprived of that right unless the court can say no genuine issue of material fact remains as to the intention of the parties that can be gleaned from contract documents at least applying the Restatement Tests or even tests more favorable to the plaintiff such as that set forth in WinstonCT Page 15536v. Mediafare Entertainment Corp. , 777 F.2d 78, 80 (CA. 2, 1985), cf. Texaco, Inc. v. Pennzoil Co., 729 S.W.2d 768 (Tex., 1987).
The Connecticut test to determine whether the parties intended to bind themselves contractually prior to the execution of a formal contract is set out in Wellington Systems, Inc. v.Redding Group, Inc., 49 Conn. App. 152, 160 (1998); Fowler v.Weiss, 15 Conn. App. 690, 693 (1988). A court must examine the language used, the circumstances surrounding the transaction and the purposes sought to be accomplished. This is not dissimilar to the Restatement test set out in comment (c) to § 27. An older case, Atlantic Terra Cotta Co. v. Chesapeake Terra Cotta Co.,96 Conn. 88 (1921), is perhaps more directly on point than the cases just cited. Atlantic Terra Cotta comments on a New York case at page 100 and in so doing underlines the difficulties presented to this court in deciding whether the question of contract formation can be decided as a question of law. At pages 100-101, the court says the following:
 "In the leading case on the subject, Pratt v. Hudson River R Co., 21 N.Y. 305, the proposal contained this provision: `Contractors, whose bids may be accepted, will be required to enter into contract;' the acceptance read, in part: `We hereby bind ourselves to enter into written contracts.' This proposal and acceptance was held to constitute a contract to enter into a written contract upon the definite terms of the proposal as accepted and the refusal of one party to execute a written contract was held in effect to be a breach of the contract evidenced by the proposal and acceptance."
Absent the type of language in Pratt, the court cannot say that the written contract requirement referred to in the Bid Form was contractually binding on the plaintiff. If it was not, how can the sending of the award letter be said to create a contract? From that perspective, the reference to a formal contract in the Bid Form is merely some evidence of the intention and understanding of the parties that in fact a written contract was required for contract formation. So although as noted, the court believes the plaintiff's arguments on this point are persuasive, it cannot as a matter of law decide the issue of contract formation.
In any event, the court, based on the foregoing discussion concludes it should be an issue for the trier of fact as to whether a contract was formed by the sending of the award letter and therefore denies each side's motion for summary judgment. CT Page 15537
Corradino, J.