ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Potomac Electric Corp. | ) | ASBCA No. 61371 |
| | ) | |
| Under Contract No. SPRRA2-17-D-0028 | ) | |

APPEARANCE FOR THE APPELLANT:     Mr. Leny Chertov
                                                                   V.P. Operations

APPEARANCES FOR THE GOVERNMENT:     Daniel K. Poling, Esq.
                                                                        DLA Chief Trial Attorney
                                                                        Edward R. Murray, Esq.
                                                                        Trial Attorney
                                                                        DLA Aviation
                                                                        Richmond, VA

OPINION BY ADMINISTRATIVE JUDGE YOUNG
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The Defense Logistics Agency (DLA or government) moves for summary judgment arguing that the undisputed facts before the Board support that no contract existed. Appellant counters that the government did in fact award a contract to Potomac Electric Corp. (Potomac). As there are genuine issues of material fact in dispute, we deny the motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On June 19, 2017, DLA issued Standard Form 33, Solicitation, Offer and Award No. SPRRA2-17-R-0053 (solicitation) as a small business set-aside for an indefinite-delivery, indefinite-quantity (IDIQ) type contract for direct current motors. The solicitation provided for the purchase of 200 motors in the base year, and 150 motors in each of four option years. The guaranteed minimum was 150 motors. The solicitation required delivery of the 200 motors in the base years 255 days after contract award. The solicitation closed on July 7, 2017. (R4, tab 1)

2. On July 7, 2017, Potomac submitted a proposal. The total price for the base and four option years was $3,319,786.22. The base year contemplated the delivery of 200 motors for $784,476.00. (R4, tab 2 at 1, 29 of 29)

3. On July 13, 2017, DLA contract specialist Harrison A. Mayfield (the contract specialist) sent Potomac an email confirming receipt of its proposal (R4, tab 3).

4. On August 15, 2017, the contract specialist sent an email to Potomac, stating: "Attached is a draft copy of contract SPRRA2-17-D-0028 and delivery order 0001. Please review, if everything is ok, have [sic] sign both, the basic contract and delivery order and return to me for processing." (R4, tab 3)

5. The Standard Form (SF) 26, Award/Contract, No. SPRRA2-17-D-0028 (contract) stated that it was awarded to Potomac Electric Corp. The DD Form 1155, Order for Supplies or Services (delivery order or DO) attached to the contract specialist's email, ordered 200 motors for $784,476.00. The DO set a delivery date of January 31, 2018, and provided a line of accounting for $784,476.00. (R4, tab 3 at 4, 49-52 of 53)

6. The contract and delivery order the contract specialist provided to Potomac were unsigned. They identified the name of the contracting officer (CO) as Angela L. Clark and included her email and phone number. (R4, tab 3 at 4 of 53)

7. On August 15, 2017, Potomac emailed the contract specialist, stating: "The solicitation...requested [delivery of] (200 units)...255 days after the award.[1] The document we received this morning, SPRRA2-17-D-0028/0001...states delivery date of 200 units as January 31, 2018.[2] Potomac Electric's price proposal is based on the Solicitation's 255 days delivery request. Could you please clarify?" (R4, tab 4 at 2-3)

8. On August 16, 2017, the contract specialist responded: "You are correct, I adjusted the delivery date. Attached is the corrected delivery schedule, if everything is ok, have [sic] sign both the basic contract and delivery order 0001 and return to me for processing."[3] (R4, tab 4 at 2)

9. Later that same day, August 16, Potomac emailed the contract specialist posing three technical questions about the electric motors. The contract specialist did not respond to Potomac's technical questions. Instead, on August 17, 2017, he forwarded them internally to other DLA personnel. (R4, tab 4 at 1-2)

---

[1] Assuming that award was made on August 15, 2017, 255 days after award would be April 27, 2018.

[2] Assuming that award was made on August 15, 2017, January 31, 2018, would be 169 days after award.

[3] The amended contract and amended DO mentioned in the contract specialist's email are not currently in the Rule 4 file, so the adjusted delivery date is unknown to the Board at this time.

10. On August 18, 2017, the CO signed a Final Price Negotiation Memorandum (FPNM).[4] The FPNM, section I, stated: "**Item/Service**: This acquisition is for spare supplies in support of the Patriot Weapon System. The requirement is a 5 Year Indefinite Delivery, Indefinite Quantity (IDIQ), Firm Fixed Price (FFP) type contract, for a DIRECT CURRENT MOTOR...with a minimum quantity of 200 each and a maximum quantity of 800 each." (R4, tab 5 at 1) Section II stated: "The Government will accept Potomac Electric proposed price, as is" (*id.* at 2). As to Delivery Schedule, the FPNM stated in section IV., ¶ A.: "The agreed to delivery schedule was negotiated[5] and confirmed for an expedited delivery by 20 January 2018 and no later than 6 February 2018" (*id.* at 5). In its conclusion paragraph, the FPNM stated:

> The award of this requirement is based on adequate competition. Therefore, award will be made to the following contractor: The responsive offer received from Potomac Electric Corp at a total price of $3,319,785.00 is considered fair and reasonable based on adequate price competition.... Contract number is SPRRA2-17-D-0028.

The FPNM shows a signature line for the Branch Chief, Tactical Missile, DLA Aviation, Huntsville, Alabama, but is not signed by her. (*Id.* at 7-8)

11. On August 18, 2017, Potomac signed and dated the contract and DO, and on August 19, 2017, forwarded them in an email to the contract specialist stating "Attached please find signed pages of the contract" (R4, tab 6 at 1, 7).

12. In the August 19, 2017 email to the contract specialist, Potomac also stated: "The 200 units release has extremely tight schedule and Potomac must get started right away." Potomac also asked DLA to address the technical questions it had posed on August 16, 2017. (R4, tab 6)

13. On August 23, 2017, the contract specialist forwarded the contract and DO signed by Potomac as well as Potomac's technical questions to the CO, stating: "Potomac has signed the basic contract and delivery order, but still wants the questions address[ed] below. If you can sign these two documents and award it in PADDs,[6] I can get distribution out hopefully today." (R4, tab 7)

---

[4] The CO signed the FPNM on August 18, 2017, at 10:51 AM. The contract specialist, who prepared the FPNM, signed it later that day at 2:47 PM, after the CO affixed her signature. (R4, tab 5 at 7-8)

[5] However, the FPNM in Section V., ¶ C.1 Evaluation of the Proposals, states that "award was made without discussions" (R4, tab 5 at 6).

[6] Believed to be Procurement Automated and Documents System.

3

14. On August 28, 2017, the chief of DLA tactical division sent an email to the DLA Aviation deputy chief counsel[7] requesting review of an "Urgent Requirement D&F [Determination and Findings]." The D&F attached to the email seeks to justify a contract award exceeding one year under unusual and compelling urgency. The D&F states that the five-year IDIQ contract to be awarded to Potomac was not synopsized pursuant to FAR 6.302-2 (which provides that full and open competition is not required when the agency's need is urgent and compelling). However, the D&F in the next sentence states that the requirement was solicited competitively, posted on FedBizOpps, and proceeds to discuss the competitive offers received. The D&F also states that the purchase of the 800 motors over 1,825 days is urgent and compelling because the motors are on backorder. Finally, the D&F states that DO 0001 will be issued to fulfill an initial backorder of 200 motors in the amount of $784,476 followed by four additional delivery orders of 150 motors each. (R4, tab 8 at 1, 4 of 7)

15. On August 28, 2017, the deputy chief counsel responded in an email that a Justification and Approval (J&A) would be the appropriate document for an acquisition on an urgent and compelling basis instead of a D&F. He also stated that an IDIQ contract, which would allow for future orders of non-urgent material, would not be the appropriate instrument under FAR 6.302-2. Rather, he recommended that the initial backorder of 200 motors be fulfilled as urgent and compelling and justified in a J&A, and that future quantities be procured under full and open competition resulting in the award of an IDIQ contract. (R4, tab 9)

16. On August 28, 2017, the CO signed a Contract Clearance Request (CCR) requesting review and approval of the FPNM attached to the CCR[8] (R4, tab 10).

17. On August 29, 2017, the contract specialist sent an email to Potomac, stating:

> Please see attached solicitation amendment. Sorry to inform you. Subject solicitation had to be changed due to this requirement being Urgent and Compelling. Instead of

---

[7] The government asserts that the communications contained in tabs 8 and 9 of the Rule 4 file are covered by the attorney-client privilege. Further, that DLA waives the privilege for these documents for the limited purpose of demonstrating that the government had not reached a decision to enter into a contract, that a final approval had not been obtained, and to show the rationale of amending and canceling the solicitation.

[8] The FPNM is not attached to the CCR provided in the Rule 4 file. It is not clear whether it is the same FPNM signed by the CO on August 18, 2017, which appears in tab 5 of the Rule 4 file.

a 5 year Indefinite Delivery Indefinite Quantity (IDIQ), it
is now a One-Time Buy for a quantity of 200 each.
When proposal is submitted, please copy everyone on
email.
Any questions, notify Contracting Officers, Henry Daniels
and Angela Clark.

(R4, tab 11 at 1)

18. On August 29, 2017, Potomac sent an email responding to the government, stating:

> Only after our phone conversation with Mr. Daniels this
> morning we realized the following: The DLA sent us the
> amendment of the solicitation SPRRA2-17-0053[.]
>
> 1. The solicitation SPRRA2-17-0053 had closed on July 7,
> 4:30PM, 2017 ET.
> 2. The government did not conduct any discussions or
> negotiations with Potomac Electric in reference to our
> proposal[.]
> 3. We received the award letter from Mr. Harrison on
> August 16th, 2017. We signed the contract (and first year
> release) a few days later and proceeded with procurement
> of materials.
> We also wrote to Mr. Harrison several times on contractual
> matters.
>
> It appears to Potomac Electric that the government decided
> to nullify our award, reopen the solicitation that has been
> closed a month ago, amended it and is now seeking new
> proposals from suppliers.
>
> We respectfully ask the government to clarify its position
> and actions toward Potomac Electric.

(R4, tab 12)

19. On September 7, 2017, the chief of DLA tactical division emailed Potomac "apologizing for all of the hardships we have put you through with this requirement" and stated that due to government errors the initial solicitation SPRRA2-17-R-0053 had not been synopsized which constituted a violation of the FAR. The government stated: "We mistakenly thought we could avoid a synopsis because the first delivery order

would be issued to satisfy an urgent requirement." The government further stated: "We discovered these errors after we had evaluated responses and sent you a 'DRAFT' copy of the award for review" (capitalization in the original text) and thus the government had "cancelled the prior solicitation." The government concluded: "Since the solicitation was never awarded, a debriefing was not and shall not be conducted with any other interested bidders." (R4, tab 14 at 2-3)

20. On October 2, 2017, Potomac submitted a claim to the CO for $27,000 for costs incurred in performance of the contract between August 16, 2017, the date of contract award, and August 29, 2017, the date Potomac stopped working on the contract (R4, tab 15).

21. On October 4, 2017, the CO sent an email to Potomac stating that since no contract had been awarded to Potomac, she "lack[ed] jurisdiction" to resolve Potomac's request for monetary compensation and that no further action would be taken upon Potomac's request (R4, tab 16).

22. On October 15, 2017, Potomac filed an appeal with the Board, docketed as ASBCA No. 61371.

23. On February 2, 2018, the government filed an answer accompanied by the instant motion, arguing that undisputed facts before the Board prove that no contract ever existed and as such, the government is entitled to summary judgment.

24. In support of its motion for summary judgment, the government submitted an affidavit by the contract specialist stating that he does not have a contracting officer's warrant and that he does not have authority to make a final award decision (gov't mot., encl. 1, ¶ 3). The contract specialist affirmed that he typically sends out a draft award to the contractor after he has decided which contractor he will recommend for award, to ensure the terms and conditions are acceptable to the contractor before he moves forward with the approval process and that he asks for the contractor's signature so that, after the award is approved, the CO can sign the same document signed by the contractor (*id.* ¶ 5). The contract specialist also stated that he prepared and signed the FPNM on August 18, 2017, and then forwarded it to the CO for signature (*id.* ¶ 8).

## DECISION

Should the Board decide that no contract existed it would have no jurisdiction to entertain this appeal, as the Board's jurisdiction stems from the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, which requires a contract between appellant and the United States. However, an appellant "need only make a non-frivolous allegation" of a contract to establish the Board's jurisdiction. *Leviathan Corporation*, ASBCA

No. 58659, 16-1 BCA ¶ 36,372 at 177,294 (citing *Engage Learning, Inc. v. Salazar,* 660 F.3d 1346, 1353 (Fed. Cir. 2011)). "This burden does not require appellant to prove that a contract actually exists, as that question goes to the merits of appellant's claim rather than the Board's jurisdiction." *Anis Avasta Construction Co.,* ASBCA No. 61107, 17-1 BCA ¶ 36,838 at 179,517 n.2. Here, Potomac has met this low burden alleging it was awarded Contract No. SPRRA2-17-D-0028 on August 15, 2017 (compl. at 1). However, the government has moved for summary judgment on the "dispositive threshold question" of whether there was a contract between the parties (gov't mot. at 1).

*I. Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). A genuine issue of material fact arises when the non-movant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant. *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541 (Fed. Cir. 1993). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

*II. There is a Genuine Dispute as to Whether There was a Contract*

The government contends that summary judgment is appropriate because the undisputed facts support that there was no contract between the parties (gov't mot. at 2). Although not directly addressing the government's argument head first, appellant disputes this assertion (app. reply at 1; app. supp. reply at 1).

Relying on *D&N Bank v. United States,* 331 F.3d 1374 (Fed. Cir. 2003), the government argues that the four elements necessary to prove the existence of a contract with the Federal Government, i.e., mutuality of intent to contract; consideration; lack of ambiguity in offer and acceptance; and authority on the part of the government representative to bind the government, are absent in this case. We examine whether undisputed facts support the absence of each of these elements.

*A. Mutuality of Intent to Contract*

The government argues that the parties never reached an agreement based on the facts that the contract specialist provided a "draft" contract to Potomac (gov't mot.

7

at 5); that government personnel never believed that the government had entered into a contract (*id.* at 5-6); and that the government never signed the contract (*id.* at 7).

It is undisputed that the contract specialist stated on his email to Potomac that the document he was forwarding was a draft (SOF ¶ 4). It is also undisputed that the document that the contract specialist sent to Potomac showed on its face the legend "Award/Contract" and bore a contract number (SOF ¶ 5) as distinguishable from the previous document that had been sent to Potomac, which on its face showed the legend "Standard Form 33, Solicitation, Offer and Award" and bore a solicitation number (SOF ¶¶ 1, 5). Potomac believed that DLA awarded it a contract (SOF ¶¶ 11, 18). Whether the document was a contract or a draft is a fact in dispute that may affect the outcome of this appeal, and thus precludes summary judgment. *Liberty Lobby*, 477 U.S. at 249.

The government argues that there was not mutuality of intent because government personnel did not believe they had entered into a contract, as evidenced by the DLA branch chief not signing the FPNM (SOF ¶ 10), and by the statements of the chief of DLA tactical division in her email to the attorney containing the D&F (SOF ¶ 14). On the other hand, documents in the record suggest that Potomac believed a contract had been awarded. For example, Potomac pointed out that the delivery date was mistaken and the contract specialist corrected the delivery date (SOF ¶ 8); Potomac signed and returned the corrected contract and DO (SOF ¶ 11); and proceeded to procure the motors to meet the tight delivery schedule (SOF ¶ 12). To paraphrase the court in *D&N Bank*, 331 F.3d at 1377, there must be more than a "cloud of evidence" to prove the government's lack of intent to enter into a contract. Here, the parties' opposing beliefs whether they were entering into a contract create a reasonable doubt as to whether there existed mutuality of intent to contract. Such doubt should be resolved in favor of the non-moving party. *Mingus Constructors*, 812 F.2d at 1391. The government has not shown that undisputed facts support that absence of mutuality of intent to contract in this appeal.

DLA also asserts that there was no mutuality of intent because the government never signed the contract. It is undisputed that the government did not sign the contract (SOF ¶ 6). Whether the contract was signed, however, is not "essential to the consummation of the contract." *Anis Avasta*, 17-1 BCA ¶ 36,838 at 179,516 (quoting *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319 (1919)). What is necessary is evidence of an intent to be bound. *Anis Avasta*, 17-1 BCA ¶ 36,838 at 179,517 (citations omitted). Here, a reasonable fact finder may conclude that the conduct of the parties suggests an intent to be bound. For example, the contract specialist issued a modification to the purported contract and DO to correct the delivery date as requested by Potomac (SOF ¶ 8); Potomac signed the contract as corrected (SOF ¶ 11); Potomac stated it must start procuring materials right away (SOF ¶ 12); and the CO signed the FPNM in terms mirroring Potomac's offer and expressed her intent to award the

contract to Potomac "as is" (SOF ¶ 10). These are material facts that support opposing views that may affect the outcome of the decision. *Liberty Lobby*, 477 U.S. at 249. Accordingly, the government has not met its burden of showing that uncontroverted facts support the absence of mutuality of intent to contract.

### B. Consideration

The government, in discussing the elements necessary to prove the existence of a contract, states: "Appellant here lacks all of these elements except consideration" (gov't mot. at 2). The government offers no further discussion, and the Rule 4 file is devoid of relevant documentation. As the record is not clear with regard to this issue, summary judgment is not appropriate. *See CiyaSoft Corp.*, ASBCA Nos. 59519, 59913, 17-1 BCA ¶ 36,731. Accordingly, the government has failed to meet its burden.

### C. Lack of Ambiguity in Offer and Acceptance

The government asserts that undisputed facts show that there was ambiguity in offer and acceptance in that Potomac was still seeking clarification of the contract terms during the times relevant to this appeal (gov't mot. at 9). Potomac directly disputes this assertion (app. reply at 1-2; app. supp. reply at 1).

Relying on *Russell Corp. v. United States*, 537 F.2d 474 (Ct. Cl. 1976), the government avers that a definite offer and an unconditional acceptance must be established. While it is uncontroverted that Potomac sought clarification of technical details in its email of August 19, 2017 (SOF ¶ 12), the facts in the record show that Potomac signed and returned to the government what Potomac believed to be a contract (SOF ¶ 11). Other documents in the record suggest that the terms of Potomac's offer were mirrored in documents generated by DLA. For example, the SF 26, Contract Award (SOF ¶ 5); the FPNM (SOF ¶ 10); and the D&F (SOF ¶ 14) all mirror the price of Potomac's offer, i.e., 200 motors in the base year for $784,476. We concur in principle with the court in *Russell* that a definite offer and an unconditional acceptance must be established. However, whether DLA unambiguously accepted Potomac's offer is a material issue of fact in dispute, precluding summary judgment in this appeal.

### D. Authority on the Part of the Government Representative to Bind the Government

The government argues that summary judgment must be granted because it is an undisputed fact that Potomac never communicated with a CO (gov't mot. at 3).[9]

---

[9] The government also argues that the CO lacked authority because DLA failed to comply with regulatory requirements, such as obtaining contract clearance and

9

The government relies on *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947), for the proposition that anyone entering into an arrangement with the government takes the risk of ascertaining that the official purporting to act for the government stays within the bounds of his authority. *Id.* at 384. In the appeal at hand, it is uncontroverted that the contract specialist did not have authority to bind the government (SOF ¶ 24). However, the shadow of the CO looms large over the actions of the contract specialist. The CO was aware of the terms of Potomac's offer, which were reflected in the FPNM (SOF ¶ 10) (signed before Potomac forwarded its signed contract to DLA) and in the D&F (SOF ¶ 14) (formulated after Potomac signed the contract), thus begging the question whether and to what extent the contract specialist acted as directed by the CO. In his affidavit, the contract specialist stated that he generally sends the contract to the contractor to sign first, so the CO can sign the same document (SOF ¶ 24), which suggests the contract specialist sends out the document at the CO's direction. The contract specialist also stated in his affidavit that he prepared and signed the FPNM and then forwarded it to the CO for signature (*id.*), but the FPNM shows it was signed first by the CO and hours later by the contract specialist (SOF ¶ 10 n.5), again raising the question whether it was the CO drafting the document with the contract specialist in the limited capacity of conveying information.

Documentation of the communications between the contract specialist and the CO are notably absent from the record. While the facts in the record are not sufficient to answer these questions one way or another, they are sufficient to create doubt in the mind of a reasonable fact finder. *C. Sanchez & Son*, 6 F.3d at 1541. Such doubt must be resolved in favor of the non-movant. *Celotex*, 477 U.S. at 322. The government has not carried the burden of establishing the absence of genuine issue of material fact showing that the government representative lacked authority to bind the government.

We have carefully considered DLA's argument that a valid contract does not exist between the parties. We conclude that there are genuine issues of material fact that preclude summary judgment, *inter alia*, whether the instruments in the current record document a contract between the parties, whether the exchanges and conduct of the parties support the existence of an agreement between DLA and Potomac, and whether the government official involved had authority to bind the government. "These issues are fact intensive and, based on the current record, are not ripe to be resolved by summary judgment." *CiyaSoft*, 17-1 BCA ¶ 36,731 at 178,896 (citing *Cooley Constructors, Inc.*, ASBCA No. 57404, 11-2 BCA ¶ 34,855 at 171,457).

---

selecting the appropriate type of contract for an urgent and compelling purchase (gov't mot. at 8-9). We do not need to reach these issues, as the authority of the government representative is a material fact in dispute as discussed in the main text of this opinion.

10

## CONCLUSION

The motion is denied.

Dated: March 11, 2019

LIS B. YOUNG
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61371, Appeal of Potomac Electric Corp., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11